## ALBANY STEAM TRAP CO. v. WORTHINGTON et al.

(Circuit Court of Appeals, Second Circuit. April 8, 1897.)

1. PATENTS—DISCLAIMERS.

A patentee cannot, by means of a disclaimer, filed after issuance, incorporate into a claim for a combination a feature not before claimed in connection with that combination, and thereby make a new combination.

2. SAME—CONSTRUCTION AND INFRINGEMENT—PUMP-REGULATING VALVES.

The Blessing patent, No. 207,485, for an improvement in pump-regulating valves, construed in connection with the disclaimer filed April 18, 1891, and held to be limited to the particular combination of parts shown or their fair equivalents, and to cover the merely described means for automatically

regulating a pump for returning to a steam boiler the water 'of condensation in a closed system. 73 Fed. 825, affirmed.

This is an appeal from a decree of the circuit court, Southern district of New York. The suit was for alleged infringement of United States patent No. 207,485, granted August 27, 1878, to James H. Blessing, for an improvement in pump-regulating valves. The circuit court held that defendants' structure did not infringe, and dismissed the bill.

Edward N. Dickerson, for appellant.

M. H. Phelps and M. B. Philipp, for appellees.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The defendants have constructed steam-heating plants, which may be briefly described as consisting of (1) a boiler which supplies steam for an engine, and also for the heating coils, the pressure of steam for the latter being reduced (2) by a reduction valve; (3) steam coils or radiators; (4) return pipes from the radiators, which bring back the water of condensation to a closed steam-tight vessel, known as the "pump governor"; (5) a pump connected with the pump governor, which, when in action, pumps the water of condensation into the boiler; (6) a pipe connection from the boiler supplying live steam to drive the steam pump; (7) a steam valve in this pipe; (8) a device for opening and closing this valve, as the water in the pump governor rises or falls, such device being a float operating the valve by resting on the surface of the water. When the water in the pump governor rises to a predetermined height, the float rises, the valve is opened, and pumping begins. When pumping has reduced the water to a predetermined level, the float descends, the valve is closed, and pumping ceases. It is not disputed that except in one particular everything found in defendants' plant antedates the patent in suit, being found in what is known as the "Syracuse Plant." The one point of difference is that in the Syracuse Plant the pump was started and stopped by the operator, who turned the steam on or off, being apprised when to do so by a water gauge on the vessel which held the water of condensation. The steam valve of the pump, therefore, was not operated by a float or other automatic device, as it is in defendants' system. We do not understand that it is contended that in mechanical details defendants' automatic device infringes the automatic device of the patent. Certainly, if any such contention be made, it is wholly without foundation. Defendants' device, with its float moving the lever, which turns the valve, is old and simple, and in no sense the equivalent of the complicated structure of the patent. The contention of complainant seems to be that infringement may be found in "any apparatus adapted for use in a closed system [of steam heating] to regulate a pump through the action of the water supplied to the pump," wherein the rise and fall of the water causes the device to open or shut the valve. What force there is in this contention may be seen by an examination of the patent.

The specification sets forth that the patentee has invented "a new and useful improvement in pump-regulating valves"; the object of the invention being "to regulate the action of a boiler-feed pump by means of the quantity of water which is fed to such pump, so that said pump will only operate when supplied with water, and will practically cease to operate when the water supply is stopped." The invention is then described at great length with references to the drawings. The circuit court thus epitomized the description:

"It comprises two disk-shaped vessels, provided with a spring-pressed diaphragm and two concentric pipes, the inner of which is attached to said diaphragm. The return water of condensation enters the larger pipe, and, when it has filled it and the space above the diaphragm, the weight thereof depresses the diaphragm and smaller pipe and a valve rod governing a pump regulating steam valve attached to said pipe, which causes said valve to close, and prevents the steam from operating the pump. Thereafter, the water, continuing to flow, passes into said smaller pipe, and also below said diaphragm, until its upward pressure, plus that of the spring, floats the diaphragm, elevates said smaller pipe, opens the valve, and admits the steam to the pump, which pumps water back to the boiler, and automatically stops when the supply thereof is exhausted."

We do not find that the specific device above described for automatically regulating a steam valve is anticipated. For aught that appears, it was a patentable novelty. The specification states that the invention is particularly useful in feeding pumps, which return to steam boilers the water of condensation from heating coils in buildings, dispensing with the attendance of a controlling engineer, and rendering the apparatus entirely automatic. Automatic regulation of a steam pump for returning water to the boilers was old in the steam-heating art, where the so-called "open system" was employed, and also generally in the art of forcing water into boilers by means of a feed pump which drew its water from a source of supply, whose increase or decrease supplied the means of automatic regulation. The patentee's specific contrivance for securing such automatic action, however, was new.

After describing the details of the invention, the specification proceeds:

"It will now be seen that, by means of this apparatus, the water supplied to a pump regulates exactly its action; so that, if more water be supplied, the pump will operate faster; if less water is supplied, the pump will operate slower; and, if no water be returned, the pump will stop entirely, unless it is desired to keep it in slow operation."

The claims relied on are:

"(1) An apparatus constructed substantially as described, whereby the amount of water supplied to a pump regulates the operation of said pump.

"(2) A pump-regulating apparatus constructed substantially as described, and placed intermediate between the water and the pump, whereby the water passing to such regulating apparatus opens the steam valve of the pump, which valve is closed on the cessation of the water supply."

It is apparent that what the patentee described as his invention, and undertook to claim, was an "improvement in pump-regulating valves," irrespective of the kind of steam plant to which they were applied. Systems for heating buildings with steam coils are referred to, but only as an illustration of one of the uses to which

the invention may be put, and where it would be particularly useful. In this respect it closely resembles the naphthol-black patent which we recently had occasion to consider in Matheson v. Campbell, 78 Fed. 910. The device of the patent is one to be "placed intermediate the water [to be fed to the boiler] and the pump," whether such water be the product of condensation or an original supply. What he had devised, as he says in the specification, was an improvement in pump-regulating valves in connection with pumps which fed water into a steam boiler, and he claimed just what he had devised. From what has been already stated as to the state of the art, it is apparent that, under these claims, the patentee could not cover any and every form of regulating device operating automatically upon the increase or diminution of the water supply, for other devices thus operating were well known; but he could cover any form of device which effected such operation by the particular combination of parts which he devised, or their fair equivalents, for, so far as the record shows, such combination was ingenious and novel. Defendants' device has no such combination, and, as the patent stands, it would not infringe. Complainant, apparently appreciating this situation, at about the time this suit was begun, filed a disclaimer, in which, after reciting that it "has reason to believe that through inadvertence the claims * * * are too broad," it "disclaims any apparatus, as included in the claims of said patent, which is not directly connected with the return pipe, H, under the pressure of the return from the heating system, without escape to the atmosphere."

It now insists that the claim relied on is for a combination of three elements: (1) A pump, (2) a regulating device, (3) a pipe directly connected to return coils in a closed system of steam heating. And it finds patentability of such combination no longer in the specific combination of concentric pipes, diaphragm, etc., but in the fact that in such closed system of steam heating any regulating device operating automatically with the rise and fall of the water in the supply tank is used, such automatic regulation not having theretofore been used in such a system. It was old in the open system, but by using it, as the patentee does, in the closed system, economy is promoted, since the water of condensation is returned to the boiler without loss of heat. The difficulty with this contention is that it substitutes a different invention from that described and claimed in the patent. It is not a narrower claim, but a different one. It is, as defendants suggest, "an attempt to incorporate into a claim for a combination a feature which had not been claimed in connection with that combination before, and thereby make a new combination." If one particular branch of the art of working in wood—cabinet making, for example—had never used circular saws, because they were supposed to be impracticable or useless or not economical, although such saws were used in other branches of the art, it might be invention to introduce them in cabinet making; and the individual who showed that they were useful, practicable, and economical in that branch of the art

might be entitled to a patent for a circular saw in combination with the other parts of an old machine. But his specification and claim would be expected to indicate just what it was he had invented and what he claimed. An individual who had invented some specific improvement in circular saws generally—something novel and useful and applicable to those tools in every branch of the wood-working art—might also obtain a patent, with a claim covering all circular saws, which would be good to restrain infringement of his particular improvement. But it would be a startling proposition that he could, 13 years afterwards, file a disclaimer of any combination containing circular saws, except such as might be used in cabinet-making machinery, and then insist that he was entitled to sustain his claim to cover all circular saws so used (with his improvement or without), on the theory that no one had used them in that branch of the art before.

We do not understand that the statutory provisions allowing a disclaimer to be filed can be thus availed of to change the invention claimed in a patent, and we are referred to no authorities which sustain complainant's contention. The object of a disclaimer is well expressed in Chemical Works v. Lauer, 5 Fish. Pat. Cas. 615, Fed. Cas. No. 12,135:

"It is designed to allow a patentee to recover on one claim of his patent, notwithstanding other claims in it are void for want of novelty. But it requires that the parts claimed without right, and the parts rightfully claimed, shall be definitely distinguishable, as matter of fact, on the face of the claims; that is, be definitely distinguished from each other in the claims."

The decree of the circuit court is affirmed, with costs.