**FIBERJOINT CORPORATION et al. v. W. R. MEADOWS, Inc.**

**No. 7223.**

Circuit Court of Appeals, Seventh Circuit.

May 27, 1940.

Albert F. Mecklenburger, A. Arnold Brand, B. Gordon Aller, and M. Hudson Rathburn, all of Chicago, Ill., for appellant.

Percy S. Webster, of Stockton, Cal., and Milton T. Miller and Chas. L. Byron, both of Chicago, Ill., for appellees.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Appellees charged appellant with infringement of Lander Patent No. 1,429,288, and Benedict and Glose Reissue Patent No. 18,188. The first patent was issued September 19, 1922, on an application filed February 19, 1920. The second was issued September 15, 1931, on an application filed September 17, 1927. This patent was a reissue of original patent No. 1,603,506, which in turn was issued on October 19, 1926, on an application filed April 8, 1920. The defenses were invalidity, non-infringement, and laches in applying for the reissue patent. The District Court decreed that both patents were valid and infringed, and from that ruling this appeal is prosecuted.

### Lander Patent No. 1,429,288.

Claim 1 of this patent was relied upon.[1] It relates to the art of treating wood and other porous material, and comprises alleged improvements over the applicant's other prior patents. The substances which are susceptible to treatment by the disclosures of this patent are such as are characterized by interstitial structures, capable of taking up a liquid by capillary absorption.

The principal object of the invention is to render porous bodies impervious to water by reason of the increased inner structural continuity imparted to such bodies by the disclosed process of impregnation. A further object is to regulate the quantity of impregnating material distributed uniformly or otherwise within the body.

The impregnating composition preferably employed comprises crude petrolatum and resin dissolved in a carrier of gasoline, or the like. When using crude petrolatum and common resin in gasoline, the latter serves as a volatile carrier which conveys the petrolatum and resin into the material to be impregnated, after which the gasoline is evaporated. By decreasing the percentage of resin and increasing the percentage of petrolatum, a composition for rendering the treated materials more pliable and soft is obtained. By varying the proportions of the volatile carrier and the impregnating material, it is possible to control the relative density and the amount of impregnating material distributed within the pores of the body. The distribution is made uniform by completely saturating the body, because saturation is obtained when an amount of liquid is absorbed that completely fills the pores irrespective of its constituency. If the volatile matter forms a relatively large proportion of the absorbed liquid, a small amount of the impregnating material remains, hence the proportion of volatile matter used determines the amount of material deposited.

It must be borne in mind that the claim here relied on is for a method or process. Other patents of appellees cover the product and the devices for producing the same. All of the claims of this patent deal with a process of waterproofing porous materials generally, and there is no specific mention of the use of such materials for expansion joints. There are four claims to this patent. The last three stress the gradual dipping of the lower end of the

---

[1] "1. In impregnating porous material by filling the interstices of the material with a composition comprising an impregnating component dissolved in a volatile carrier and evaporating the volatile carrier to deposit the impregnating component in the material, the method of regulating the amount of the component deposited which comprises substantially saturating the material with the composition before evaporating the carrier and regulating the proportion of impregnating component to carrier so that when saturated with the composition the material will contain the desired amount of the impregnating component, whereby when the carrier is evaporated the desired amount of the component is deposited in the material."

material into the fluid, and gradually increasing the depth of immersion of the material in the medium as impregnation progresses towards the upper end of the material. The specification refers to this method of immersion as a cardinal feature of the disclosure. Claim 1, however, makes no mention of this gradual dipping method, and we are not disposed to read it into the claim. If we should do so, it is obvious that appellant's method would not infringe .claim 1, because it does not employ that form of immersion.

Literally construed, claim 1 purports to teach a method of regulating the amount of the impregnating component deposited in the porous material, and regulating the proportion of the impregnating component to gasoline, and completely saturating the porous material in the bath. It says: "If the volatile matter (gasoline) forms a relatively large proportion of this absorbed liquid, evidently a small amount of the impregnating material remains; regulation of the proportion of volatile matter to impregnating material then controls the amount of the material deposited."

In carrying out the teaching of this claim, the operator first determines the quantity of the elements in his impregnating composition. The specification suggests 20 per cent resin, 20 per cent petrolatum and 60 per cent gasoline by weight, and states that these proportions have been found to be very satisfactory. However, the patentee does not limit himself to the quantities suggested, for all may vary according to the character of the articles to be treated. In each case the quantities of the elements are to be determined by the judgment of the operator. After the impregnating solution has been prepared, the fibrous material is saturated with it, and after the volatile carrier has evaporated there is a distribution of the resin and petrolatum throughout the pores of the fibrous body in the same proportion as contained in the original solution. This does not mean that the pores are full after the evaporation. Indeed, they could not be, for whatever space was occupied by the gasoline is still vacant after the evaporation. All that this claim discloses in this respect is that after the evaporation there is an even distribution throughout the pores of the fibrous material of the combined resin and petrolatum, providing of course there has been a perfect solution of the impregnating elements. This does not mean that all of the bath solution has im-

pregnated a given number of fibrous boards, or a given amount of fibrous material. It means that each item of fibrous material thus immersed has been impregnated with a solution of the particular constituency as predetermined by the operator. For instance, if the operator desires to make a bath containing 100 pounds of resin, as suggested in the specification, he would likewise use 100 pounds of petrolatum and he would use 300 pounds of gasoline.

After the gasoline has dissolved the other two elements, the solution is ready for the immersion of the fibrous element, and by that immersion and the saturation of the fibrous material, Lander claimed to have discovered a new method by which the wood fiber would be impregnated with resin and petrolatum in the precise degree which he had contemplated. As stated above, he did not limit the claim as to the particular quantities of the elements comprising the bath. He further stated that he had discovered that if one desired a stronger solution of resin and petrolatum, less gasoline should be used, and if one desired a weaker solution of those elements, he should use more gasoline.

We are unable to see any novelty in this disclosure. Certainly there was no discovery in suddenly realizing that a solution of a substance and a solvent might be made thicker or thinner by the use of more of the substance or less of the solvent. Surely, it was no discovery to realize for the first time that the saturation of a porous substance in a perfect solution of elements would distribute that solution evenly throughout the pores. Aside from the prior art, these facts have been known from time immemorial and we cannot believe that the patent laws of this country were ever intended to protect a monopoly of their use. The District Court found that the prior art furnished instances of regulating a proportion of impregnating compound and carrier, but it was of the opinion that the prior art did not disclose a precise regulation of the impregnation elements by completely saturating the material to be impregnated. We think all of these things were taught by Carmichael, No. 377,928, and clearly suggested by Moore and Rogers, No. 154,185, and Vest, No. 1,139,603. Aside from the prior art, however, we are of opinion that the claim discloses nothing which rises to the dignity of invention. Appellees suggested that Mr.

Lander was a pioneer in this sort of work and had been for many years; that he had been granted several patents in this field on products and devices and that it was not until he had had several years experience in this work that he realized the discovery and disclosures of this claim. This is not convincing on the question of novelty. It might also indicate a desire to cover prior art and mechanical skill as well as inventive genius. If this claim were allowed to stand no one could waterproof a fibrous board by saturation without paying a royalty for it. This we feel sure is not the original or present concept of our patent laws.

The District Court thought that even distribution caused by complete saturation was the novel feature in the disclosure. Of course, saturation implies completeness, but even this is shown by patent No. 377,-928 to Carmichael, which discloses a method of treating fibrous ware, in which he states that the article is left in the bath "until bubbles no longer escape." This means saturation in its highest concept, and it is so interpreted in his later patent No. 395,951, wherein he refers to "the article being at such times thoroughly saturated." Patent No. 154,185 to Moore and Rogers not only varies the proportions of the elements in the impregnating solution according to the character of the article treated, but also saturates the article. See, also, patent No. 1,139,603 to Vest who permeates the article thoroughly, and predetermines the proportions of the elements of the solution by the character of the article treated.

Reissue Patent of Benedict and Glose.

This patent relates to paving joint strips compressible and elastic in character which are adapted for use in paving structures to separate the rigid elements. One of its objects is to provide a longitudinal, corrugated joint so constructed as to interlock with the adjacent paving material at the sides of the joint, thereby acting to prevent the relative movement of such material in a vertical direction. A further object is to provide a joint which is constructed of materials which render the joint permanently resilient, thereby permitting expansion and contraction. Still another object is to provide a joint which can be preformed before being placed in the paving. Notwithstanding the corrugated feature, the specification provides that the joint may be formed of any usual or suitable material, preferably fibrous in character, such as wood pulp, and the joint may be shaped from a sheet of such material, which is impregnated with a suitable filler so that it will remain permanently resilient. Asphalt or creosote are suggested as fillers because they are waterproof and are capable of permanently retaining their resilience.

Claims 7 and 8 are relied upon. Claim 7 discloses "a paving joint strip having a resilient board-like form retaining body of the form and size of the strip, consisting of fibrous material, said body impregnated with a waterproof material." Claim 8 is the same as claim 7 except that it names asphalt as the waterproof material. We are first met with appellant's contention that these two claims constitute an attempt to recapture, by reissue, the substance of rejected claims 5 and 6, and substituted claim 5 of the original patent, No. 1,603,-506, to Benedict and Glose. In support of this contention, it asserts that the patentees acquiesced in those rejections, cancelled those claims and received the patent without them.

Patent No. 1,603,506 to Benedict and Glose was issued October 19, 1926, on an application filed April 8, 1920. The application originally had four claims, and claims 5 and 6 were added [2] and these latter claims were rejected by the Examiner on patent No. 1,223,045 to Ferguson, and they were subsequently cancelled by the applicant, and substituted claim 5 was filed.[3]

---

[2] "5. An expansion and contraction joint for concrete paving, comprising a thick stiff sheet of wood pulp impregnated with a permanently resilient filler and in direct contact with the concrete on both sides of the joint with at least its upper portions, substantially as described."

"6. An expansion and contraction joint for concrete paving, comprising a preformed thick stiff one-ply sheet of fibrous material impregnated with a permanently resilient filler and in direct contact with the concrete on both sides of the joint substantially throughout its height and on both its sides, substantially as described."

[3] "5. An expansion and contraction joint for concrete paving, consisting of a body or strip of fibrous material formed to proper shape and constituting the desired joint and having all of its exposed portions uniformly impregnated with a filler of a permanently elastic character, substantially as described."

Thereupon, it was rejected, and the applicant cancelled it and requested the patent to issue and it was issued on October 19, 1926, without claims 5 and 6 and substituted claim 5.

The application for reissue of this patent was based on the specifications set forth in the original, and it alleged inadvertence, accident or mistake in the failure of the original patent properly to claim the corrugation or tongue and groove construction. New claims were added to these alleged defects, and the present claims 7 and 8, now in issue, were added.

■ It is first contended by appellant that the adding of claims 7 and 8 was not properly supported by any showing that they were left out of the original patent by reason of inadvertence, accident or mistake. On the contrary, appellant contends that claims 7 and 8 contain nothing which was not fully set forth in claims 5, 6 and substituted claim 5 of the original patent. Hence, appellant urges that because those claims were rejected and acquiesced in by the applicant, appellees cannot recapture them, or their substance, by the reissue, without complying strictly with the statute which requires the showing of inadvertence, accident or mistake. We are of the opinion that this contention is sound. See Leggett v. Avery, 101 U.S. 256, 25 L.Ed. 865; Altoona Theatres v. Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. The affidavit upon which the reissue was bottomed alleges no inadvertence, accident or mistake with respect to any matter except the corrugation, and it is clear that neither claim 7 nor 8 discloses anything with respect to corrugation.

■ Other claims of the reissue apparently cure the inadvertence, accident and mistake, if any, with respect to corrugation, and we do not understand that the statute would permit the patentee to add other matters to his original patent which were not omitted from the original patent by inadvertence, accident or mistake. 35 U.S.C.A. § 64. Whether or not claims 7 and 8 are substantially the same as claims 5, 6 and substituted claim 5 in the original patent, would make no difference, there being no showing made at the time of the reissue upon which claims 7 and 8 could be based.

■ Moreover, we are convinced that claims 7 and 8 cover with precision the disclosures of claims 5, 6 and substituted claim 5 of the original patent, and disclose nothing more than would amount to inventive genius. In argument before this court, counsel for appellees was asked if, in his opinion, claims 7 and 8, if valid, would infringe claims 5, 6 and substituted claim 5 of the original patent, if valid. He replied that he was unable to answer the question without further study. A study of these claims impels us to conclude, under those circumstances, that infringement would be inescapable. However, the mentioned claims of the original patent were held invalid, and of course cannot form the basis for anticipation. But, they were held invalid because they were anticipated by Ferguson, and patentees acquiesced in the ruling. We approve of that ruling and we hold that the claims in suit are anticipated by Ferguson. The mere fact that patentees substituted wood fiber for Ferguson's "felt or fiber" is not sufficient to constitute a patentable distinction.

For the reasons stated we think the claims are invalid. It is therefore unnecessary to pass on the defense of laches. The decree is reversed and the cause remanded, with instructions to dismiss the bill for lack of equity.